9-0, Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Incorporated. Good morning, Your Honors. I'd like to reserve two minutes for rebuttal. Yes. Peter Klarfeld on behalf of Appellate Baskin-Robbins Franchising LLC. The complaint in this case seeks two declarations. One, that a territorial franchise agreement, or TFA, between Baskin and Appellate Alpenrose Dairy expired in 2014, and the second, that there's no compensation owed to Alpenrose in connection with that expiration. The grounds for finding that the District Court for the District of Massachusetts had personal jurisdiction over Alpenrose in this case are compelling. First, Baskin's claims arise directly out of Alpenrose's contacts with Massachusetts, namely its renewals of and the party's performance under the TFA. That strikes me as a rather artificial way to look at it. It seems to me the party's claims here arise out of, on the one hand, the declaration claim for the validity of the termination of the agreement arises out of the TFA. It doesn't arise out of the termination agreement. It arises out of the territorial franchise agreement. The parties have certain rights and obligations under it. The question is whether it was or was not validly or irrevocably terminated. The second is even more clearly disassociated, because the second count is whether or not under the Washington Franchise Protection Statute, in the event that the TFA is deemed canceled or deemed not renewed, is the proper phrase, compensation is going to be due under that statute. So I'm struggling with this conception that these arise out of the termination notices. Then I wasn't clear. They arise out of the TFA. The TFA was renewed twice when Baskin was in Massachusetts. That's true. There was active solicitation and parties went forward for 12 years. So it arose out of the TFA. The first declaration then arose out of the letters that were sent to Baskin in Massachusetts in 2013 and 2014. And the second claim, the Washington claim, arises out of the agreement and the letters as well, because there's a preceding legal question, and that is whether Baskin refused to renew the TFA or whether the TFA expired as the result of Alpenrose's election not to renew it. And that is going to drive the decision under the Washington Statute as to whether Baskin refused, and that's the term, to renew. That's certainly true. But it seems to me your case pretty much boils down to the fact that because party A mails into a jurisdiction a notice of renewal or a notice of termination and also makes royalty payments to another party, to party B, who is at a particular time in that jurisdiction because that's what party B chooses to be, not for some reason essential to the agreement, but out of the choice of party B, that somehow that's the sort of minimum contacts that will confer a jurisdiction, and we certainly don't have any case in this circuit that indicates that that's so. I didn't see any in your brief that really indicate that contacts as limited as that can support a finding of personal interest. Well, let me explain. The contacts are not as limited as that. Once the affirmative solicitation was made for further... Wait, what's the affirmative solicitation? The renewal. That's a solicitation? Affirming of a notice that's called for under the contract. That's right. And what it did was, whether you call it a solicitation or you call it a renewal or you call it anything else, what it did was it affirmed a desire to continue a relationship with a party that was in Massachusetts. Counsel, in responding to Judge Sully's question, it would be helpful to me, you suggest that with the renewal of the contract, your client now had to perform in Massachusetts in many ways. What was the nature of the performance called, imposed upon your client in Massachusetts by the contract? Okay, there are two parts to the answer to that question. One is what the contract anticipated and then what the parties, what Baskin actually did. There's no question the contract provided for Alpenrose to sell ice cream and Baskin-Robbins franchises in the Pacific Northwest. That's what Alpenrose did under the contract. But under section 10A through 10D of the TFA, all of those activities had to be carried out in conformance with rules and regulations that were prescribed by Baskin and could be changed and would be changed and were changed from time to time. And those evolving rules and regulations and oversight and product changes all emanated from Baskin's headquarters. But there was nothing in that agreement that required any of that oversight to be carried out from any particular place. That was all Baskin's choice. I think in the first instance we're talking purposeful availment. We're talking whether or not Alpenstock availed itself of Massachusetts. Baskin, to the extent it performed oversight or services, if you want to call it that, at all, performed them for most of the life of the TFA in California because that's where it chose to be. So you're saying that because it moved its headquarters to Massachusetts and it was convenient for Baskin to perform those activities there, that that somehow subjects its franchisee to jurisdiction in Massachusetts. I've looked, I think, carefully to try and find any case that fairly read supports that proposition and I can't do it. Let me address that. First of all, I don't have a court of appeals case right on point. We did cite a case out of the Northern District of New York where there was a... Yeah, but first of all, it's the Northern District of New York. Well, I understand that, Your Honor. It's about two words long and it's really not much. I understand that. What happened over the past two years is that this court has refined, I think, the standard for voluntariness. It did it in Downer in 2014, it did it in Cosert in 2015, and it did it in Copia at the beginning of this year. And there are now three, basically three, questions that go into the determination of purposeful availability. I don't want to cut you off. You've made that argument in your brief. But you treat those as though those cases somehow occupy the universe and have wiped out our prior jurisprudence. There is a case in this circuit that's reasonably close to this case and that's the Lyle Richards case. We've never overruled that. We've never suggested that that isn't good law. And that's a case that holds against you. Okay. I still have to answer Judge Lippis' question and I will answer that question and remind me if I miss a third. Lyle, what the court emphasized in Lyle was not that the defendant didn't perform services in the forum, it's that the plaintiff didn't. And to get back to Judge Lippis' question, what are the provisions that, what took place here? Again, I'd cite section 10 of the TFA, it's the appendix at 66, A through D, and also E, which required Alpenrose to keep Baskin continuously informed of virtually everything that it did, and Baskin would then exercise its oversight of Alpenrose's activity. Once you get over the, whether you call it voluntariness or initial solicitation, whatever you call it, once you accept that Alpenrose affirmatively elected to do business in Massachusetts, it sent the letters. The letters are in the appendix. Your argument is, sure, Baskin, having been in California for a long time, decided to move to Massachusetts. Yes, Alpenrose was not going to have to deal with them in Massachusetts, but even given that reality, they twice decided to renew the agreement, and that was clearly a voluntary decision on their part. Isn't that the essence of your voluntariness argument? That is, in fact, the essence. And once you get there, this case is Burger King. I mean, it's not exactly there were differences in the contract, but I can walk through the kinds of services, the kinds of oversight, the kinds of product development that were the basis for jurisdiction in Burger King, and that's exactly what went on here. You filed affidavits in this case? I'm sorry? You filed affidavits in this case? Yeah, certifications, yes, Your Honor. Do they describe how you performed oversight? Yes, they do, Your Honor. And where you performed it? I'm sorry? And where you performed it? Yes, sir. The certification of Lawrence Flynn, who is the controller of Dunkin' Brands, at the appendix 97 through 99, describes Alpenrose's monthly payments of fees to Baskin and Massachusetts, and under Section 12 of the TFA, Alpenrose was required to submit reports with each of those payments showing the sales on which those fees were calculated.  The certification of Shelby Magliari, who is the Global Quality Assurance Manager for Baskin, appendix at 122 through 125, describes her regular communication with Alpenrose regarding the ice cream samples that Alpenrose was required to send to Baskin in Massachusetts every quarter, and she has a chart for the last four years of all of the detailed comments that went before her. She also describes Baskin's regular communications with Alpenrose regarding product specifications and formulations, including communications regarding more than 500 modifications since 2010. The certification of Fred Malone, which is at the appendix 144 to 154, describes the continuous interaction between Baskin and Alpenrose with respect to customer complaints and the use of Baskin's marketing materials. The certification of Betsy Rotberg, who is Baskin's Supply Change Manager, describes her email exchanges with Alpenrose two to three times a month regarding the manufacture of Baskin's flavors of the month and rotating flavors, and Alpenrose does not refute any of that. All it says is that, and frankly I find this to be by some perverse logic, that it shouldn't be recognized by the court because it facilitated Alpenrose's performance out in the Pacific Northwest. Well, that is exactly why, under this court's decision in Downer, that is exactly why all of those contacts are attributable to Alpenrose. Counsel, isn't there a significant difference in this case and the Burger King case in the sense that, I mean the Supreme Court describes in some detail the intense negotiations that took place between the prospective Michigan franchisee and Burger King in Florida, and there's also the franchisee sent somebody to Florida to engage in the training program. That all takes place in a very intense time period. You then finally get an agreement and then the problems begin shortly thereafter the agreement is reached. The point is that there, the negotiating history was very close in time to the subsequent alleged breach of the agreement. Here, the negotiating history, whatever it is, is lost in time. It has no, there is no resemblance to what was going on in Burger King. A couple of points, Your Honor. Number one, I don't think the negotiating history back in California in 1965 has anything to do with this. What brings it to Massachusetts? But the negotiating history in Burger King had a lot to do with the decision of the Supreme Court there. Well, it had to do with, in the sense that there was, at the end of the day, there was an affirmative election to do business with a franchisor in another state, understanding what that entailed. And there is the same affirmative election here in the renewals. They knew exactly what it entailed. They'd been operating under it for 30 years, not even operating under it for three years with Baskin in Massachusetts. So, I think, I think, I'm also not sure that there was much, if any, negotiation that took place in Florida. That may be correct. On the other hand, Alpenrose's co-president, Rod Berkland, went to Massachusetts when Baskin had been purchased by a new parent and met with the new parents. This was the year before his election was due in 2007. And the next year, he elected to renew. So, it's hard for me to see how this is not a voluntary and knowing election to do business with Baskin in Massachusetts. And I've just recited for the first time. You've reserved some time for rebuttal. I did. I think I've overcome my... All right. Thank you, Eric. Good morning. Eric Karp for Alpenrose Dairy. I think the question presented in this case is how a transplanted California corporation that chose to move from California to Massachusetts 33 years after this agreement had been executed, after it had been amended three times while the company was in California, extended five times while it was in California, can then come to Massachusetts and suggest that because it moved to Massachusetts, the voluntary act of sending notices of renewal somehow confers jurisdiction on this commonwealth. Well, I don't think that's a fair summary of the appellant's position. The appellant's not saying the mere act of sending the notice of renewal. The appellant says, we're working at this franchise relationship to the knowledge of Alpenstock. We're doing things in Massachusetts that they know about, like evaluating samples, like calculating remittances, like scrutinizing the administrative reports that they're sending in to Massachusetts at agreed intervals. And when they renew the agreement, knowing that we're doing all of those agreement-related things in Massachusetts, they are availing themselves of Massachusetts. That's more their argument. I'm not saying it's a good argument, but it's much more than merely because they renewed the contract. Well, then let me address, first of all, the issues of notices and payments, because that figure's in their argument. I think the case law in Cosey of Communication, as well as Prairie Eye and Lyle Ashworth, indicates that mere administration of a contract inside the jurisdiction or a contract performed principally outside the jurisdiction does not confer jurisdiction. In addition, notices are for the convenience of the party that specifies the notice. That's what Cosey says. So the notice provision does not give any notice to Alpenrose that it could be hailed into a court 3,000 miles away. For all it knows, that notice could have been from one city in California to another city in California. And as we say in our brief, if Baskin-Robbins really wanted to make it voluntary or foreseeable, they would have put a venue clause in the territory franchise agreement like they do in their individual franchise agreements, which require all disputes to be litigated in Alpenrose's territory. In addition to that, all of this performance, as alleged in the brief, whether it's product specifications, whether it's remittances, they mention customer service line, they mention shipment of samples, they mention access to product specifications. And as we say, every franchise agreement, every contract like this does anticipate some administration of the contract outside the jurisdiction. But that doesn't confer jurisdiction here because the focus of this contract was two things. What did Baskin-Robbins want out of this relationship at the very beginning? It wanted a foothold in the Pacific Northwest. And as Mr. Berkman says, so Alpenrose entered into this relationship and agreed to do two things. Manufacture, distribute, and sell ice cream, but only in their assigned territory. They couldn't sell in Massachusetts even if they wanted to because their territory has a restriction. It was gradually expanded over time. That's what the amendments were about during those periods of time. The second thing that they agreed to do was to recruit and sell franchises, which they did. And the record reflects that Alpenrose eventually recruited about 175 franchisees, 106 of which are in Washington. And all of that, all of that work, all of that focus of the contract was to develop Baskin-Robbins brand and business in the Pacific Northwest. And I suggest that Alpenrose performed admirably in that regard. So why isn't this, why isn't this case largely controlled by Burger King? I mean, you have their, you have the company headquarters in Florida, you have the franchise agreement with an entity in Michigan. Burger King becomes concerned about the defaults in the way that that contract is being performed. They worry about its effect on their brand, if you will. And so, to register their concerns about those breaches, they file suit in Florida. That sounds a lot like what we have here. So why doesn't that case control? Reason number one, at the time this contract was formed and during the three times, at the three times that it was amended, Massachusetts was a complete stranger to this contract. There's no evidence that Massachusetts played any role in the formation of this contract, as is indicated in some of the cases that have been issued in this circuit. It was a complete stranger. And as this court suggests, and I'm not saying Prairie Eye stands for this proposition, but it suggests that jurisdiction ought not to be portable. That somebody who gets hailed into court should not have to follow the plaintiff all the way around the country. And the second thing is that in Burger King, the company stayed stationary. It remained in Florida and the franchisee knew that it was dealing with a Florida corporation. Here, there was no way for Alpenrose to know that 33 years into this relationship, Baskin Robbins would pick up and go elsewhere. And so, if the relocation of Baskin Robbins was a problem for your client, they had ample opportunity to go elsewhere, to not renew the contract. Well, but that ignores the sunk costs and the substantial investment they made in developing this territory and the business that they had built up based on their own business. As reflected in the record, during the previous 15 years, $167 million of wholesale ice cream sales and $24 million of revenue generated by franchisees that they had recruited and supervised in the Pacific Northwest. So, to say that it was voluntary for them to extend isn't really true because in order for them to continue to capitalize on this investment in which they had invested literally 50 years of their experience, they had no choice but to send a notice that if Baskin Robbins had moved to Timbuktu or wherever it had moved, then they would have had to send a notice there. Obviously, Alpenrose did not choose Massachusetts. Baskin Robbins chose Massachusetts. There are a number of certifications that have been talked about this morning about testing that was done in Massachusetts and email communications, customer complaint situations where they're directed to call into Massachusetts. Does the record disclose the nature and extent of personal trips that are made by Alpenrose employees to Massachusetts? Yes, it does. And what it says very specifically is that Mr. Berkman made one courtesy call in Massachusetts after the company changed hands. There's nothing in the record that there were any substantive discussions or negotiations. It was a contract extension. It was strictly, I think a fair reading of the record would be, a courtesy call he wanted to meet the new owners. The second contact was by another member of the family, a Kim Berkman, who served on something called the Brand Advisory Board, which is a voluntary organization of area franchisees that then communicate issues and concerns to the franchise board. And I would suggest to you that these are both what I would call and what Lyle, the Lyle Richards case suggests, is extra contractual activity. That is to say, it was activity within the state that was not required by the contract, that was strictly voluntary, and that had nothing to do with the administration of the contract, just basically maintaining a relationship between the parties. And therefore, I don't think it's dispositive. I don't think it's even a factor in whether or not there's jurisdiction here. Well, I suppose if there were enough of it, it might be an argument for general jurisdiction, but that's not what's at issue here, right? Yes, that's correct. So, essentially, as I read the cases, the gloss that's put on Downer has been basically three factors. Was there solicitation of the contract in the forum? The answer here is no. Well, that depends on what you consider solicitation. The plaintiff would answer that yes, and saying you solicited that by sending the renewal notice into the forum. Yes, and I would suggest, and we say in our brief, that there is a substantial qualitative difference between negotiations between negotiations over the formation or amendment of a contract and a ministerial act of extending an agreement which you have an absolute right to extend simply by providing a written notice to that effect. That's not a formation of a contract. That's just simply a ministerial act that extends the existing arrangement without change. And I think there's a qualitative difference there. The second factor is was there any anticipation of services by Alpenrose in the forum? And the answer to that is clearly no. As I earlier indicated, their territory franchise agreement literally prohibited them from operating in any place other than the four states that eventually became their territory in the Pacific Northwest. And I think that's what caused the disposition of the decisions in Copia Communications and Prairie Eye because in both of those situations, in the case of Cocia Communications, that was an internet provider that provided internet services to a hotel in Jamaica. There was no anticipation of services in Massachusetts and therefore no basis for jurisdiction. But there also wasn't in that case the sort of continuing relationship that Appellant's Counsel describes here. The continuing checking the quality of the product, sending the samples back and forth, administrative reports, nothing of that. That was strictly a buyer-seller relationship, not as integrated as a franchise relationship. That is true. I'm not sure that Copia is much help to you on that point. Well, I would agree but I would also say that it's fair to say that almost any contract between two entities, one of which is in-state and one of which is out-of-state, is going to involve some form of administration, oversight, checking of payments and receipts. And I think it's fair to say from reading Copia Communications that receipts of notices and payments is not enough. The proper focus is where did you anticipate the performance of the contract would occur and in that case it was clearly Jamaica and not Massachusetts. Same in Prairie Eye which involved an ophthalmologist that was solicited to take a job in Illinois. The issue there was did Massachusetts have jurisdiction over the litigation between the employer-offerer and the ophthalmologist employee and the answer was that because the parties did not anticipate that the ophthalmologist would actually see patients in Massachusetts but only in Illinois that that would be the case. Counsel, there's been very little discussion of the so-called gestalt factors. Is it your position that we don't even have to reach those because of the relatedness and purposeful availment factors clearly lead to a conclusion that there's no jurisdiction here, that we don't even get into those? Well, what I would say is that our position is that you don't need to get there but if you get there, I think the gestalt factors definitely weigh in our favor in two particular areas. One is the issue of applying the Washington Franchise Investment Protection Act. If you look at this court's decision in CoSART, what you basically said is that Massachusetts had an interest in that case of enforcing its own wage act which was implicated in that case. In C.W. Downer, the issue was Canadian law versus Massachusetts law. The court's decision indicates that there wasn't a substantial difference between the law of the two jurisdictions, not the case here. Here, there is a very specific Washington Franchise Investment Protection Act which Alpenrose believes it's entitled to because 106 out of 175 of its franchisees are in the state of Washington. But what's the basis for your assumption that a Massachusetts court under ordinary conflict of laws principles wouldn't apply that act even if the venue of the suit were in Massachusetts? I'm not saying that it wouldn't. What I'm saying is that the state of Washington has a particular interest in enforcing its own very specific franchise protection scheme that is completely absent in Massachusetts. So there's a substantial difference between the laws of the jurisdiction in this case which was not present in COSART or in C.W. Downer. And then I would also indicate that I think the lack of convenience to Alpenrose is very significant. Distance is a factor. It is 3,000 miles. And I think this was, from our perspective, a preemptive lawsuit. We are the state of Massachusetts. The issue here is that Alpenrose is severely inconvenienced by having to come to a state that it never actually chose. Well, your client is not some small business. It is itself a large corporation that could sustain whatever the costs are. I mean, that's relevant to the analysis. It doesn't seem in this day and age all that burdensome to have to come across the state of Massachusetts for a 1404A transfer of any. The district        And I think that's a very important point. I think that's a very important point. I think that's a very important point. And presumably, if we decide that there is jurisdiction, the next step is for the district court to weigh the very factors you just mentioned and determine whether the interests of justice make it appropriate for this case to be litigated in Washington. Unless there are further questions, thank you. Thank you.  questions? Thank you. May it please the court. What I hear Mr. Carp arguing is something akin to the mere administration of this contract in Massachusetts shouldn't be recognized, but what went on here is exactly what went on in Burger King. In Burger King licensed intellectual property, its trademarks, its recipes, its know-how to a franchisee in Michigan. Here, after 2001, Baskin licensed its trademarks, know-how, and recipes to a franchisee in Oregon. The franchise agreement in Burger King anticipated that Burger King would provide evolving standards and specifications to its franchisee in Michigan and that its franchisee would be subject to ongoing regulation and oversight by Burger King from Florida. Following Alpenrose's 2001 and 2007 renewals, the TFA anticipated that Baskin would provide similar standards, specifications, and oversight from Massachusetts to Oregon. The Supreme Court found that the franchise agreement in Burger King envisioned wide ranging contracts between Burger King and the franchisee in Michigan. Following Alpenrose's 2001 and 2007 renewals, the TFA similarly envisioned wide ranging contracts between Baskin and Massachusetts and Alpenrose in Oregon. With respect to the comment that a plaintiff should not have to follow a plaintiff when the plaintiff moves, I think that works from 1998 when Baskin moved to Massachusetts in the middle of a term to 2002 because that was Baskin's choice. In 2001, the year out, Alpenrose made a choice to continue to do business in Massachusetts and made the same choice in 2007. The ‑‑ You're not going to have time for this sentence. Thank you. Okay.